

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**UNITED STATES OF AMERICA**

-vs-                                    **Case No.  6:05-cr-131-Orl-28UAM**

**C. KEITH LAMONDA**
**JESSE W. LAMONDA**
**JOHN L. MAYNARD**

---

## SENTENCING MEMORANDUM

Defendants C. Keith LaMonda, Jesse W. LaMonda and John L. Maynard are before

me for sentencing.  The jury returned guilty verdicts finding C. Keith LaMonda guilty of the

following charges contained in the First Superseding Indictment ("FSI") (Doc. 73):

| | |
|---|---|
| Count One: | Conspiracy to Commit Mail and Wire Fraud (18 U.S.C. § 371) |
| Counts Two-Twelve: | Mail Fraud (18 U.S.C. §§ 1341-42) |
| Count Thirteen: | Conspiracy to Commit Mail and Wire Fraud (18 U.S.C. § 371) |
| Count Fourteen: | Conspiracy to Commit Tax Fraud (18 U.S.C. § 371) |
| Count Fifteen: | Filing a False Income Tax Return (26 U.S.C. § 7206(1)). |

The jury also returned verdicts of guilty against Jesse W. LaMonda on the following counts:

| | |
|---|---|
| Count One: | Conspiracy to Commit Mail and Wire Fraud (18 U.S.C. § 371) |
| Counts Two-Twelve: | Mail Fraud (18 U.S.C. §§ 1341-42) |
| Count Thirteen: | Conspiracy to Commit Mail and Wire Fraud (18 U.S.C. § 371). |

By its verdicts, the same jury found John L. Maynard was guilty of the following counts

contained in the FSI:

| | |
|---|---|
| Count Thirteen: | Conspiracy to Commit Mail and Wire Fraud (18 U.S.C. § 371) |
| Count Fourteen: | Conspiracy to Commit Tax Fraud (18 U.S.C. § 371). |

It is now my obligation to impose a reasonable sentence pursuant to 18 U.S.C. § 3553(a) –

one that is "sufficient, but not greater than necessary, to comply with the [statutory] purposes"

of sentencing.  18 U.S.C. § 3553(a).

## I. Background

This case arose as a result of Defendants' involvement in the viatical industry.  C. Keith LaMonda and Jesse W. LaMonda facilitated the purchase of life insurance policies through Accelerated Benefits Corporation ("ABC").  Some of these purchases were made from people ABC knew had misrepresented the true status of their health in order to obtain life insurance. C. Keith LaMonda and his brother, Jesse W. LaMonda, conspired to conceal that the policies had been viaticated so that the insurance companies would not have a chance to challenge coverage during the contestability period on grounds that the policies were procured by fraud.  Defendants also sold interests in the policies purchased through ABC.  In marketing investment opportunities in the policies, Defendants, through ABC, conspired to defraud investors.

C. Keith LaMonda and John L. Maynard also conspired to impede, impair, obstruct, and defeat the Internal Revenue Service ("IRS") "in the ascertainment, computation, assessment and collection of the income taxes of Jennifer Lauer, C. Keith LaMonda and the LaMonda Management Family Limited Partnership." FSI ¶ 80.  Finally, C. Keith LaMonda filed a false income tax return.

Defendants entered pleas of not guilty and the charges contained in the FSI were tried to a jury. The trial lasted seven months and resulted in the guilty verdicts listed above. The United States Probation Office has filed Presentence Reports ("PSRs") regarding each Defendant.  The reports include pertinent personal information as well as individual Sentencing Guideline offense level computations. In response to the PSRs, each Defendant

filed a sentencing memorandum (Docs. 820, 813 & 817) in which they registered objections to the reports and argued the merits of lenient sentences. The Government also filed a sentencing memorandum (Doc. 810) raising a single objection to the PSRs. Following receipt of the sentencing memoranda, a sentencing hearing was held for the purposes of oral argument as to all sentencing issues and providing Defendants with an opportunity to allocute. At the hearing, Jesse W. LaMonda and John L. Maynard personally addressed me; counsel for C. Keith LaMonda spoke on his behalf.

## II.  Obligations of Sentencing Judge After *Booker*

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court held that "'the Sixth Amendment right to trial by jury is violated where under a mandatory guidelines system a sentence is increased because of an enhancement based on facts found by the judge that were neither admitted by the defendant nor found by the jury.'" United States v. Magluta, 418 F.3d 1166, 1185 (11th Cir. 2005) (quoting United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir. 2005)) (emphasis omitted), cert. denied, 126 S. Ct. 2966 (2006).  Additionally, Booker "established that it is error for [a] district court to sentence a defendant under a mandatory Guidelines scheme, even in the absence of a Sixth Amendment enhancement violation." Id. (internal quotation, citation, and bracketing omitted). As a consequence, the Supreme Court in Booker excised the two provisions from the Sentencing Reform Act of 1984, 18 U.S.C. § 3551 et seq., that had made the United States Sentencing Commission Guidelines ("Guidelines") mandatory. See Magluta, 418 F.3d at 1185 (citing Booker, 543 U.S. at 245-46). Thus, the Guidelines remain in effect, but only in an advisory form. Id.

In the wake of Booker, district judges have three obligations in determining an

appropriate sentence. First, judges must "calculate *correctly* the sentencing range prescribed by the Guidelines." United States v. Crawford, 407 F.3d 1174, 1178 (11th Cir. 2005). Second, it must not be forgotten, in the midst of so much emphasis on the continued viability of the Guidelines, that judges are required by the Sixth Amendment to refrain from treating the Guidelines as mandatory whether out of "ignorance, negligence, . . . defiance" or any other reason. United States v. Rodriguez, 406 F.3d 1261, 1273 (11th Cir. 2005) (denying rehearing en banc) (Carnes, J., concurring); see also United States v. Jaber, 362 F. Supp. 2d 365, 367 (D. Mass. 2005) ("'[A]dvisory' does not mean a regime without rules, or a return to the standardless sentencing which preceded the [Sentencing Reform Act]. Nor does it mean slavish application of the Guidelines under the guise of fair 'consideration,' an approach which is now unconstitutional.") (footnote omitted). Third, after consulting and considering the advisory Guidelines, judges must impose a "reasonable" sentence. Crawford, 407 F.3d at 1178-79. A district judge may impose a more severe or less severe sentence than that called for by the Guidelines so long as the sentence is reasonable. Crawford, 407 F.3d at 1179. The extent to which a sentence is reasonable depends not only on the advisory sentencing range, but also on the numerous other factors listed under 18 U.S.C. § 3553(a), including "the need for the sentence imposed . . . to provide just punishment for the offense," id. § 3553(a)(2)(A), "to afford adequate deterrence to criminal conduct," id. § 3553(a)(2)(B), and "to protect the public from further crimes of the defendant," § 3553 (a)(2)(C).

The Eleventh Circuit grants discretion to the trial court to determine on a case-by-case basis the weight to be given to the Guideline score, so long as that determination is made

with reference to the remaining § 3553(a) factors that the court must also consider in calculating the defendant's sentence. United States v. Hunt, 459 F.3d 1180, 1184 (11th Cir. 2006).   Notwithstanding the intricacy of our current sentencing scheme, there is no prescription as to how § 3553(a) factors are to be weighed in determining what constitutes a reasonable sentence.  In the end, it is within the discretion of the sentencing court to decide the weight to be assigned to § 3553(a) factors.  See United States v. Williams, 456 F.3d 1353, 1363 (11th Cir. 2006) ("The weight to be accorded any given § 3553(a) factor is a matter committed to the sound discretion of the district court.").

In the recent case of Rita v. United States, 127 S. Ct. 2456 (2007), the Supreme Court provided further guidance to sentencing judges.  Although the Supreme Court held that "a court of appeals may apply a presumption of reasonableness to a district court sentence that reflects a proper application of the Sentencing Guidelines," id. at 2462, the court made it clear that "the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply," id. at 2465.  In attempting to arrive at a reasonable sentence, the sentencing judge is expected to "subject[] the defendant's sentence to the thorough adversarial testing contemplated by federal sentencing procedure."  Id.  This obligation may require the judge to consider an argument that "the Guidelines sentence should not apply, perhaps because (as the Guidelines themselves foresee) the case at hand falls outside the 'heartland' to which the Commission intends individual Guidelines to apply, perhaps because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless." Id. (citations omitted).  Notwithstanding the rigorous process of determining the application of

the intricate Guideline scheme in arriving at a correct total offense level, the consideration of arguments that there should be a departure from the sentence prescribed by the Guidelines, and the weight to be given § 3553(a) factors, it is ultimately the duty of the sentencing judge "to impose a sentence 'sufficient, but not greater than necessary, to comply with'" the purposes set forth in 18 U.S.C. § 3553(a)(2). Id. at 2463.

Once the sentencing judge has determined what a reasonable sentence is, it is incumbent upon the judge to explain the decision, setting "forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." Id. at 2468. This obligation enures to the benefit of the parties and the public who also have an interest in knowing that arguments have been considered and that there is a reasoned basis for the sentence imposed.

## III. Defendants' Objections to PSRs

The Probation Office has assisted me in fulfilling my obligation to correctly calculate Defendants' sentencing ranges under the Guidelines. In response to the thorough PSRs, each Defendant registered specific objections. During the sentencing hearing, each Defendant selectively adopted objections and arguments made by the others. The Government objected to a single conclusion of the Probation Office. The following rulings have been made as to each of the objections raised by the parties.

### A. The Applicable Guideline Manual

There is a dispute regarding which edition of the Guidelines Manual should be used in calculating Defendants' total offense level. The 2007 edition of the Manual is instructive on the question, providing that ordinarily the sentencing judge "shall use the Guidelines

Manual in effect on the date that the defendant is sentenced." U.S. Sentencing Guidelines Manual [hereinafter "USSG"] § 1B1.11(a) (2007). This general rule does not apply, however, when application of the Guidelines "in effect on the date that the defendant is sentenced would violate the ex post facto clause of the United States Constitution" because the sentence called for by the later edition of the Guidelines Manual would result in a more severe sentence. Id. § 1B1.11(b)(1). In such instances, "the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed." Id.

Regardless of which Guidelines Manual is used – the one in effect when the crime was committed, or the one in effect at sentencing – only one manual is to be used. This is known as the "one book" rule. See United States v. Bailey, 123 F.3d 1381, 1403 (11th Cir. 1997) ("The practice of applying only one version of the guidelines when calculating a defendant's sentence has been referred to as the 'one book rule.'") (quoting United States v. Corrado, 53 F.3d 620, 623 (3d Cir. 1995)). In keeping with the "one book rule," the Guidelines contain instructions regarding the appropriate manual to be used in sentencing the same defendant for offenses committed at different times. Section 1B1.11(b)(3) provides that "[i]f the defendant is convicted of two offenses, the first committed before, and the second after, a revised edition of the Guidelines Manual became effective, the revised edition of the Guidelines Manual is to be applied to both offenses."

The parties in the instant case agree that the ex post facto rule bars the use of the 2007 Manual currently in effect, but they disagree as to whether the court should use the 2000 edition of the Manual or the 2001 edition. The 2001 Manual became effective November 1 of that year. The Government agrees with the Probation Office that the 2001

edition applies. The Government reasons that the 2001 version of the Manual must be used because the jury returned verdicts of guilty to Counts 13 and 14, which contained allegations that the conspiracies continued beyond November 1, 2001, the effective date of the 2001 Manual. The FSI alleged that the conspiracy charged in Count 13 continued until March 2002 and that the conspiracy charged in Count 14 continued "through on or about November 2, 2001." See FSI ¶¶ 55 & 80. The Government argues that by its guilty verdicts the jury determined that the crimes charged in Counts 13 and 14 were committed during the time the 2001 Guidelines Manual was in effect and, therefore, the 2001 Manual applies. To apply another date, argues the Government, would be to go behind the jury's verdict.

John L. Maynard has, from the outset, encouraged the court to apply the 2000 edition, which is more lenient with regard to loss calculation in fraud cases.[1] Mr. Maynard contends that regardless of the conduct of his co-defendants in furtherance of the conspiracies, his participation ceased before the 2001 Guidelines Manual came into effect on November 1 of that year. Because, as he argues, the conduct of his co-defendants after November 1, 2001, was unforeseeable to him, the 2000 manual must be used in calculating his Guideline score. He insists that to apply the 2001 Guidelines Manual in calculating his sentence would violate the ex post facto rule.

Conspiracies are, by their nature, continuing offenses, and the bright line approach advanced by the Government of simply applying the Guidelines Manual in effect on the last

---

[1]At the sentencing hearing the LaMondas abandoned their argument in favor of using the 2001 version of the Manual and joined in Mr. Maynard's argument that the 2000 version applied. They failed to make persuasive argument in support of their change in position.

day the charging document alleged the conspiracy to have continued will not always work. Rather, there must be evidence that a conspiracy continued after the effective date of the Guidelines used at sentencing. See United States v. Buckhalter, 986 F.2d 875, 880 (5th Cir. 1993) ("So long as there is evidence that the conspiracy continued after the effective date of the [amendments to the] guidelines, the Ex Post Facto Clause is not violated."). The conspiracy continues as to each conspirator until he withdraws or until the conspiracy is complete. It is not necessary that a defendant know of the acts of his co-conspirator as long as it is foreseeable that those acts would continue to a time when the applicable Guidelines are in effect. United States v. Devine, 934 F.2d 1325, 1332 (5th Cir. 1991).

With regard to Count 13, the post-November 1, 2001 acts of C. Keith LaMonda and Jesse W. LaMonda were foreseeable to Mr. Maynard. Mr. Maynard assisted C. Keith LaMonda and others in operating a "shell game" involving the secretive transfer and concealment of funds from an account dedicated to the payment of premiums on the policies in which ABC clients had invested. Mr. Maynard was instrumental in executing much of this scheme, the goal of which was to use the funds taken from the premium account to make personal investments for C. Keith LaMonda, including an investment in a gas and oil exploration project. While there is no evidence that he engaged in overt acts in furtherance of the conspiracy after November 1, 2001, it was foreseeable that the scheme would continue and that the co-defendants would make false representations to investors after November 1, 2001, in an effort to conceal the fact that they and Mr. Maynard had wrongfully taken funds from the Premium Account. See FSI ¶ 75.

It is even more clear that the conduct of Defendants in Count 14 is covered by the

2001 edition of the Guidelines.  Count 14 describes a tax conspiracy involving a series of financial transactions undertaken by C. Keith LaMonda and Mr. Maynard using money from ABC and ATCO accounts.  These transactions were conducted in such a way as to conceal taxable income of C. Keith LaMonda and Jennifer Lauer from the IRS.  See FSI ¶¶ 76-128. Given the fact that these transactions were designed to conceal income, it was entirely foreseeable to Mr. Maynard that C. Keith LaMonda would not file a tax return in 2000 disclosing income he received in 1999 and that C. Keith LaMonda would cause a false return to be filed in 2001.  The overt acts in furtherance of this conspiracy culminated with the filing of a false tax return on behalf of the LaMonda Family Limited Partnership on November 2, 2001, one day within the period covered by the 2001 edition of the Guidelines Manual.

I find that Counts 13 and 14 continued to a time covered by the November 1, 2001 edition of the Guidelines Manual and that the conduct of Mr. Maynard's co-conspirators was foreseeable to him.  The Probation Office correctly used the 2001 edition of the Manual in calculating Guidelines scores for all three Defendants.[2]  Even if the 2001 edition of the Guidelines Manual applied to only one of the conspiracies, the "one book" rule would require application of that edition.

## B. Appropriate Grouping of Offenses for Guidelines Purposes

In determining the Guidelines offense level for a defendant convicted of multiple offenses, the sentencing judge is required to group closely-related offenses together for purposes of scoring.  See USSG § 3D1.1 ("[T]he court shall: (1) Group the counts resulting

---

[2]Accordingly, unless specified otherwise, citations herein to the Guidelines Manual are to the 2001 version.

in conviction into distinct Groups of Closely Related Counts ('Groups') by applying the rules specified in § 3D1.2."). The Guidelines provide that "[a]ll counts involving substantially the same harm shall be grouped together into a single Group." Id. § 3D1.2. Providing further guidance, the Guidelines continue:

> Counts involve substantially the same harm within the meaning of this rule:
>
> (a)     When counts involve the same victim and the same act or transaction.
>
> (b)     When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.
>
> (c)     When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.
>
> (d)     When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

Id. Applying § 3D1.2, the Probation Office concluded that since all crimes of conviction involve a monetary objective and that offense levels are determined largely on the basis of total harm or loss, all counts should be grouped together.

The Defendants agree with the Probation Office's single grouping, but the Government objects. Instead of a single grouping, the Government contends that there should be three groups constituted according to classification of the victims and that at the very least, fraud offenses and tax offenses should be grouped separately. The Government advocates the following groupings: the victims in Counts One through Twelve were insurance

companies and, accordingly, these Counts should be grouped together; in Count Thirteen the victims were ABC investors and therefore these counts should form a separate group; and finally, the IRS was the victim of the tax offenses charged in Counts Fourteen and Fifteen requiring a third grouping. The Government candidly points out that the Eleventh Circuit has not clearly endorsed the Government's position that fraud and tax offenses should be grouped separately. See United States v. Torrealba, 339 F.3d 1238, 1243 (11th Cir. 2003) (citing United States v.Braxtonbrown-Smith, 278 F.3d 1348 (D.C. Cir. 2002)). Compare United States v. Martin, 363 F.3d 25, 43 (1st Cir. 2004) (tax and fraud counts should not be grouped), United States v. Shevi, 345 F.3d 675, 680 (8th Cir. 2003); United States v. Peterson, 312 F.3d 1300, 1303 (10th Cir. 2002), United States v. Braxtonbrown-Smith, 278 F.3d 1348, 1356 (D.C. Cir. 2002), Weinberger v. United States, 268 F.3d 346, 354-55 (6th Cir. 2001), and United States v. Vitale, 159 F.3d 810, 813-15 (3d Cir. 1998), with United States v. Gordon, 291 F.3d 181, 192 (2d Cir. 2002) (tax and fraud counts should be grouped), and United States v. Haltom, 113 F.3d 43, 46 (5th Cir. 1997) (tax and fraud counts grouped when fraud is specific offense characteristic of the tax counts).

Under § 3D1.2(d), the grouping of "[c]ounts involving offenses to which different offense guidelines apply" depends on two factors. USSG § 3D1.2 cmt. n.6. First, the offense levels for the counts must be "determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm." Id. § 3D1.2(d). Second, the offenses must be "of the same general type." Id. cmt. n.6.

### 1. Determination of Offense Levels Based on Total Harm or Loss

There is no question in this case that the offense levels for fraud and tax evasion are

"determined largely on the basis of the total amount of harm or loss," arising from those offenses. After grouping the offenses, the Probation Office determined that 24 of C. Keith LaMonda's 42 total offense levels were attributable to financial loss. See C. Keith LaMonda PSR at 16. Financial loss was also the most significant factor in calculating the scores of Jesse W. LaMonda and Mr. Maynard (24 of totals of 38 offense levels). See Jesse W. LaMonda PSR at 16; John L. Maynard PSR at 16-17. With regard to each Defendant, the next highest level increases are 6 for base offense level and 4 for number of victims, or, in the case of C. Keith LaMonda, 4 for role in the offense. The Government's proposed grouping of the offenses further emphasizes the significance of financial loss in arriving at a total offense level for each crime of conviction.[3]

### 2. Same General Type Requirement

The commentary to § 3D1.2(d) does not define "same general type" but instructs that the phrase "is to be construed broadly." USSG § 3D1.2 cmt. n.6. The 2000 edition of the

---

[3] *C. Keith LaMonda* – For Count Thirteen (Group 1), the Government calculates a total offense level of 42, 24 of which result from a fraud loss of $87,966,244. As for Counts One through Twelve (Group 2), the Government calculates a total offense level of 18, which results from a fraud loss of $6.6 million. Counts Fourteen and Fifteen (Group 3) result in a total offense level of 26, with 22 being derived from a tax loss of $1,293,490. Pursuant to USSG § 3D1.4(c), the combined offense level is 42 because the second and third groups are 9 or more levels less serious than the first group.

    *Jesse W. LaMonda* – Count Thirteen (Group 1) is scored at a total offense level of 38, with 24 points attributed to a $89,301,724 fraud loss. Counts One through Twelve (Group 2) result in a total offense level of 30, with 18 levels included for a fraud loss of $6.6 million. Applying USSG § 3D1.4(c), the combined offense level is 38.

    *John L. Maynard* – Count 13 constitutes Group 1 and is scored at a total offense level of 38, with 24 of those levels included due to the $51,245,705 fraud loss advocated by the Government. Count 14 (Group 2) carries a total offense level of 28, with 22 levels included based on the Government's tax loss calculation of $1,293,490. Applying USSG § 3D1.4(c), the combined offense level is 38 because the second group is 9 or more levels less serious than the first group.

Guidelines Manual explained that "[t]he 'same general type' of offense . . . would include, for example, larceny, embezzlement, forgery, and fraud."[4]  USSG § 3D1.2 cmt. n.6 (2000). Although the commentary failed to specify the category under which the four exemplary offenses fall, or otherwise explain why the offenses might be deemed as generally the same for grouping purposes, the illustration nonetheless offers some insight into the meaning of the "same general type."

In this regard, three aspects of the commentary's illustration are noteworthy.  First, "larceny, embezzlement, forgery, and fraud" share no one formal element in common.  While each offense typically involves the unlawful taking of property, only larceny and embezzlement are, by definition, property crimes. See Black's Law Dictionary 561, 677, 685, 896 (8th ed. 2004) (defining only larceny and embezzlement as necessarily involving the unlawful taking of property); see also United States v. Williams, 154 F.3d 655, 657 n.1 (6th Cir. 1998) (referring to the four offenses as "property crimes, broadly defined").  Similarly, whereas embezzlement and forgery are types of fraud, the same is not true of larceny.  See Black's Law Dictionary 897 (8th ed. 2004) (defining "larceny" as "[t]he unlawful taking and carrying away of someone else's personal property with the intent to deprive the possessor of it permanently").  Second, the four offenses are not classified as the same type of offense "elsewhere in the Guidelines." Williams, 154 F.3d at 657 n.1.  For instance, under the 2000 edition of the Guidelines Manual, embezzlement was defined under Chapter 2, Part B as an

---

[4]In later editions of the Guidelines Manual, this illustration is omitted.  Presumably, this is because a single guideline, USSG § 2B1.1, now covers "larceny, embezzlement, forgery, and fraud," thus rendering inapplicable the instruction in the commentary to § 3D1.2 regarding "[c]ounts involving offenses to which different offense guidelines apply." See, e.g., USSG § 2B1.1 (2007).

offense involving property, while forgery was characterized as an offense involving fraud or deceit under Chapter 2, Part F.[5] See id. ("Presumably, the drafters added this illustration of 'same general type' in order to reinforce the notion that property crimes, broadly defined, are to be grouped, notwithstanding the fact that certain of the offenses listed do not fall within the definition of property crimes elsewhere in the Guidelines."). Lastly, the loss-to-offense level ratios for the offenses were not the same under pre-2001 Guidelines. Compare USSG § 2B1.1(b)(1) (2000) (loss table for embezzlement and larceny), with id. § 2F1.1(b)(1) (2000) (loss table for fraud and forgery). In short, these three aspects of the commentary's illustration at least signal what is *not* required for offenses to be of the "same general type" for purposes of grouping and, thereby, underscore the instruction that "[t]he 'same general type' of offense is to be construed *broadly*." Id. § 3D1.2 cmt. n.6 (emphasis added).

In arguing that the tax and fraud offenses should not be grouped, the Government does not endeavor to construe the terms of § 3D1.2(d) or its accompanying commentary. Instead, the Government merely contends that tax evasion and fraud involve "different victims." In my view, this argument does not possess sufficient merit to foreclose the grouping of tax evasion and fraud under § 3D1.2(d).

The Government's argument, presumably seeking to establish that tax evasion and fraud are not sufficiently generally "the same" for the purposes of § 3D1.2(d) pays little heed to the guidance set forth in the guideline and its commentary. First, in regard to the Government's emphasis on "different victims," the Second Circuit has persuasively observed

---

[5]Under the most recent version of the Guidelines, both offenses are now defined even more broadly as "basic economic offenses." USSG Ch. 2, pt. B (2007).

-15-

that "[i]t would be wrong . . . to project a same-victim requirement into § 3D1.2(d) [when] . . . no such requirement is mentioned in [the guideline]." United States v. Napoli, 179 F.3d 1, 9 (2d Cir. 1999). The "omission" of any reference to victims in § 3D1.2(d) is particularly significant "in light of the fact that subsections (a) and (b) [of § 3D1.2] both explicitly require harm to the 'same victim.'" Id. Furthermore, "the [b]ackground to § 3D1.2's [c]ommentary states that counts 'involving different victims (or societal harms in the case of 'victimless' crimes) are grouped together only as provided in'" § 3D1.2(d). Id. (emphasis removed). "Finally, [the commentary] to [§ 3D1.2(d)] gives examples of counts that should be grouped under that subsection, including cases in which a 'defendant is convicted of two counts of theft of social security checks and three counts of theft from the mail, *each from a different victim.*'" Id.

The fact that there are differences in the fraud and tax evasion loss tables is of no significance in resolving the question of grouping. As noted earlier, the losses for "larceny and embezzlement" and the losses for "forgery and fraud" were previously calculated under distinct loss tables, yet these crimes were specifically set forth in the Guideline's commentary as groupable offenses. Compare USSG § 2B1.1(b)(1) (2000) (loss table for theft), with id. § 2F1.1(b)(1) (2000) (loss table for fraud). See also id. § 3D1.3(b) (2000) (providing that "[w]hen . . . offenses of the same general type to which different guidelines apply (*e.g., theft and fraud*) [are grouped pursuant to § 3D1.2(d)], the offense guideline that produces the highest offense level [should be applied]") (emphasis added).[6]

---

[6]Although the variation in the fraud and theft tables no longer remains in the latest edition of the Guidelines, the fact remains that § 3D1.2(d) originally contemplated the grouping of offenses with different loss tables. One might argue, of course, that such

I conclude that a fair reading of § 3D1.2(d) demands that fraud and tax offenses be grouped. See United States v. Gordon, 291 F.3d 181, 189-93 (2d Cir. 2002), vacated on other grounds after remand, 543 U.S. 1105 (2005) (explaining that tax evasion and fraud should be grouped under § 3D1.2(d) and holding that § 3D1.3 requires that quantifiable offenses be grouped under § 3D1.2(d) rather than § 3D1.2(c)). As one court has observed, tax evasion is, at its essence, an "attempt to defraud the government by evading [taxes]." United States v. Robinson, 974 F.2d 575, 578 (5th Cir. 1992) (internal quotations and citation omitted); see also Black's Law Dictionary 1501 (8th ed. 2004) (defining tax evasion as "[t]he willful attempt to defeat or circumvent the tax law in order to illegally reduce one's tax liability"); 26 U.S.C. § 7201 (tax evasion statute).[7] Taking this basic fact together with the instruction in the commentary to § 3D1.2(d) to construe "same general type" broadly, there is little doubt that tax evasion and fraud are offenses of "the same general type."[8] Accordingly, I agree with the Probation Office's recommendation and conclude that all fifteen counts should be included in a single group. The Government's objection is overruled.

---

inference should no longer obtain now that the fraud and theft tables are symmetrical. Yet, had the Sentencing Commission intended to defeat the inference that offenses with different loss tables can or should be grouped, it must be assumed that they would have done so expressly, rather than merely allowing for one inference to be countered with another.

[7]Indeed, the Eleventh Circuit has, on at least one occasion, used the terms "tax evasion" and "tax fraud" synonymously. Blohm v. Comm'r, 994 F.2d 1542, 1554 (11th Cir. 1993) (referring to a conviction for tax evasion under 26 U.S.C. § 7201 as "a criminal tax fraud conviction").

[8]In the alternative, the crimes of fraud and tax evasion may also be broadly classified as property crimes, given that both offenses are generally committed to effect deprivations of property. As the illustration of "larceny, embezzlement, forgery, and fraud" makes clear, the fact that neither fraud nor tax evasion requires an actual deprivation of property is not necessarily determinative of whether the offenses are of the same general type.

### C. Bias of the Probation Officer

Defendant C. Keith LaMonda accuses the probation officer who authored the PSR of bias. There is no evidence of bias and this objection is therefore overruled.

### D. Defendants' Specific Objections to the Factual Accuracy of the Reports

Defendants filed numerous objections to the factual accuracy of the PSRs. Those objections that did not bear on the Guidelines Score or consideration of the sentence were addressed in open court. As to those objections not abandoned by Defendants, rulings were announced from the bench. There is no need or benefit in addressing those matters again.

### E. Specific Offense Characteristics

Defendants object to the Probation Office's recommendation that the base offense levels for the crimes of conviction be increased based on certain specific offense characteristics. These objections are addressed in the sequence that the characteristics were presented in the PSR.

#### 1. Loss Calculation (USSG § 2B1.1(b)(1)(M))

Under the Guidelines, loss, more than any other factor, determines the severity of sentences in fraud cases. The fraud loss table not only drives the seriousness of the penalty, but it does so with precision, providing incrementally longer prison terms as the amount of loss increases. This formulaic approach is ironic because the means of determining loss is not at all precise; the method of assessing loss perhaps depends on the nature of the fraud in question. See United States v. Orton, 73 F.3d 331, 333 (11th Cir. 1996) (observing that the sentencing court must "consider the nature of the scheme in determining what method is to be used to calculate [loss]"). For instance, if a victim pays the perpetrator of a fraud a

-18-

Case 6:05-cr-00131-JA-GJK  Document 971  Filed 01/02/08  Page 19 of 57 PageID 7547

certain amount for a worthless item, the loss is simply the amount paid. The task becomes more complicated, however when the item purchased has some value to the victim. In that case, it falls upon the sentencing court to calculate the value of the loss. Where intended loss is easily calculated and is greater than actual loss, that figure should be used. See USSG § 2B1.1(2)(A) & cmt. n.2. "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense," and "'[i]ntended loss' (I) means the pecuniary harm that was intended to result from the offense; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur." Id. cmt. n.2(A)(i)-(ii). If application of these rules do not produce a reasonably accurate loss calculations, judges may use average loss. See United States v. Snyder, 291 F.3d 1291, 1295 (11th Cir. 2002) ("Where precise figures are not ascertainable, it is preferable to calculate the victims' loss by determining 'the approximate number of victims and an estimate of the average loss to each victim . . . .'").

The task of determining fraud loss is even more difficult in conspiracy cases because increases in offense level attributed to each defendant depend on the amount of loss resulting from criminal activity that (1) was within the scope of the agreement entered into by each defendant and (2) was reasonably foreseeable by that defendant. See USSG § 1B1.3(a)(1)(B) & cmt. n.2. Nonetheless, sentencing judges are obligated to make loss determinations as accurately and fairly as possible. See United States v. Medina, 485 F.3d 1291, 1304 (11th Cir. 2007) ("A reasonable estimate of the loss amount is appropriate because often the amount of loss caused by fraud is difficult to determine accurately.") (internal quotation marks and citation omitted). When the amount is in dispute, the Government bears the burden of establishing the amount of the loss by a preponderance of

-19-

the evidence.

### a. Counts 1-12 – C. Keith LaMonda and Jesse W. LaMonda

By its guilty verdicts, the jury determined that C. Keith LaMonda and Jesse W. LaMonda conspired to defraud various insurance companies. The scheme involved ABC's purchase of 49 fraudulently-obtained life insurance policies. ABC's purchases occurred within two years after the policies were issued, namely, the contestability period. During this two-year period the insurance companies could challenge the coverage on grounds that the policies were issued based on the misrepresentations of the applicants. Defendants defrauded the insurance companies by making misrepresentations to the companies to conceal the viatication of the polices and prevent cancellation. The purpose of the scheme was to defraud the insurance companies into paying the death benefits once the policies matured. Evidence established that the combined death benefits of these policies was $6.6 million. This is the amount of loss Defendants intended to cause the insurance companies; the loss was within the scope of their agreement and this pecuniary harm was foreseeable by both Defendants. Although the actual loss suffered by the companies was $417,000, the Guidelines provide that the intended loss should apply because it is greater than actual loss. See USSG § 2B1.1 cmt. n.2(A). The loss calculation for Counts 1-12 is $6.6 million.

### b. Count 13 – All Defendants

With regard to Count Thirteen, I accept the loss calculation of $87,991,018 reported by the Probation Office and urged by the Government. This loss amount was established by exhibits received in evidence as well as witness testimony. The summary of the calculation contained in the PSR is repeated here. On March 13, 2001, a state court in Oklahoma

entered a judgment in favor of the Oklahoma Department of Securities, finding that ABC had engaged in fraud in the sale of viaticals. Subsequently, on February 6, 2002, the Oklahoma court appointed a conservator to take over the administration of ABC's policies that had not matured or lapsed. At the time the conservator took control of the policies, they had a total face value of approximately $141 million. Investors invested $107 million in the same policies, and almost 90% of the insureds survived beyond the life expectancy projected by ABC. Thus, the fair market value of the policies was far less than the face value. Pursuant to the conservator's request, the Oklahoma court approved of a sale of the policies for $59 million, payable over time. At the time of sale, the portfolio had a present value of $25 million.

The Government conducted a search of the ABC premises in May 2001. As a part of the search, the Government made mirror images of ABC's computers. The information taken from the computers included a record of investor deposits received by ABC between 1995 and 2000, revealing that during this period, Defendants, through ABC, received $140 million from investors for the purchase of viaticals. In assessing loss, the Government subtracted $22 million in insurance maturities paid to investors by ABC, $25 million representing the present value of the portfolio sold by the conservator, and approximately $4 million in maturities paid to investors by the conservator prior to the sale of the portfolio. The Government asserts that the difference of approximately $88 million is a fair calculation of fraud loss. I agree.

The entire $88 million loss was within the scope of the agreements entered into by C. Keith LaMonda and Jesse W. LaMonda and was reasonably foreseeable to both of them. The conduct of Defendants in defrauding investors occurred from the inception of the

Case 6:05-cr-00131-JA-GJK   Document 971   Filed 01/02/08   Page 22 of 57 PageID 7550

conspiracy to its conclusion and the resulting loss to investors occurred within the scope of and pursuant to the conspiracy. The record is replete with individual acts taken by both Defendants in furtherance of the conspiracy. The scope of John L. Maynard's involvement is, however, limited to the time of his participation. He did not become involved with the scheme until January 1998 when he began work with C. Keith LaMonda at ABC and he is therefore only responsible for loss after February 1, 1998. The amount of loss for that period is $51,245,705.

"For purposes of [fraud loss calculation] 'reasonably foreseeable pecuniary harm' means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." USSG § 2B1.1 cmt. n.2(A)(iv). Applying that principle in this case, C. Keith LaMonda and Jesse W. LaMonda are responsible for the total loss calculation for Count Thirteen because they devised the scheme and executed it throughout term of the conspiracy. The loss of $51,245,705 was foreseeable to John L. Maynard.

### c. Count 14 – C. Keith LaMonda and John L. Maynard

With regard to Count Fourteen, I find C. Keith LaMonda and John L. Maynard are responsible for a tax loss of $1,295,490. This loss incurred was within the scope of the conspiracy and it was foreseeable by both Defendants.

In summary and in making these findings, I have considered the arguments of counsel for Jesse W. LaMonda that because the fraud loss advocated by the Government is speculative, it should not be used in calculating the loss level under the Guidelines table. Instead, counsel argues that loss should be set at the amount of gain actually realized by

Defendants. See United States v. Munoz, 430 F.3d 1357, 1369-71 (11th Cir. 2005), cert. denied, 126 S. Ct. 2305 (2006) (finding that it is appropriate to base fraud loss on gain when there is insufficient evidence to determine loss sustained by victims.)

　　　　　2. Enhancement Based Upon More Than 50 Victims (USSG § 2B1.1(b)(2)(B))

Pursuant to USSG § 2B1.1(b)(2)(B), the Probation Office included a four-level enhancement because "the offense involved 50 or more victims." The Government argues that this enhancement was correctly included, but Defendants object, not contesting the number of victims, but arguing that including this enhancement along with the loss calculation discussed above would constitute improper double-counting. Defendants reason that in this case, the loss amount is directly related to the number of victims – the number of victims being the reason the loss amount is high. Relying on United States v. Lauersen, 348 F.3d 329 (2d Cir. 2003), vacated on other grounds, 543 U.S. 1097 (2005), Defendants contend that the 24-level enhancement under § 2B1.1(b)(1)(M) for amount of loss renders the additional enhancement under § 2B1.1(b)(2)(B) impermissible. This argument does not, however, withstand scrutiny under Lauersen or Eleventh Circuit authority.

In Lauersen, the appellate court determined that application of the three upward adjustments recommended by the Probation Office (intended loss,[9] abuse of trust,[10] and financial institution as a victim,[11]) in fact did not constitute impermissible double-counting because the enhancements serve different purposes. 348 F.3d at 343. The Eleventh Circuit

---

[9]USSG § 2F1.1(b)(1)(N).

[10]USSG § 3B1.3.

[11]USSG § 2F1.1(b)(8)(B).

-23-

has reached the same result in analyzing the question of double-counting of enhancers. In United States v. Stevenson, 68 F.3d 1292, 1293 (11th Cir. 1995), the court held that "cumulative enhancement of a sentence under both the more than minimal planning provision of USSG § 2F1.1(b)(2) and the aggravating role provision of USSG § 3B1.1" was permissible. The Stevenson court explained that "[d]ouble counting a factor during sentencing is permitted if the Sentencing Commission . . . intended that result and each guideline section in question concerns conceptually separate notions relating to sentencing." Id. at 1294. Moreover, without specific evidence of the Commission's intent to the contrary, it will be presumed that the Commission intended that the enhancements be applied cumulatively. Id.; see United States v. Naves, 252 F.3d 1166, 1168 (11th Cir. 2001) (concluding that the carjacking enhancement[12] to the base offense level for robbery does not constitute impermissible double counting).

The upward adjustments in question here – loss amount and number of victims – involve conceptually separate aspects of sentencing, one having to do with loss and the other concerned with the number of people harmed by defendant's conduct. Because the Sentencing Commission has not registered an expression to the contrary, it is presumed that the Commission intended the enhancers to be treated cumulatively. Defendants' objection is overruled.[13]

---

[12]USSG § 2B3.1(b)(5).

[13]Whether the inclusion of upward adjustments in addition to loss amount results in overlapping that may be taken into account in considering a downward departure as suggested by Lauerson is discussed in section III.C.b infra.

### 3. Violation of Administrative Order (USSG § 2B1.1(b)(7)(C))

Defendants C. Keith LaMonda and Jesse W. LaMonda object to the two-level increase for "violation of any prior, specific judicial or administrative order, injunction, decree, or process." USSG § 2B1.1(b)(7)(C). The increase applies when a defendant's criminal conduct constitutes a fraud in violation of an "official judicial or administrative warning, in the form of an order, injunction, decree, or process, to take or not to take a specified action." Id. § 2B1.1 cmt. n.5(C). The Government and the Probation Office argue that the increase applies to C. Keith LaMonda and Jesse W. LaMonda because their criminal conduct was in contravention of a Consent Order (Trial Ex. 102(c)) entered by Pete Mitchell on behalf of the State Treasurer and the State Department of Insurance on October 31, 1997.

Defendants do not contest that C. Keith LaMonda violated the terms of the Consent Order, but instead argue that the Order does not technically qualify as an "order, injunction, decree, or process" under § 2B1.1(b)(7)(C). Essentially, Defendants contend that the Order was not issued as a result of a proceeding under the Florida Administrative Procedures Act and that the record is devoid of evidence of authority for Mr. Mitchell to represent the State Treasurer, who, at the time the letter was written, was in charge of the Florida Department of Insurance.

Authority addressing the applicability of § 2B1.1(b)(7)(C) is scant but helpful. United States v. Spencer, 129 F.3d 246, 252 (2d Cir. 1997), involved an informal agreement between the defendant and the Department of Transportation ("DOT"). The agreement provided that the DOT would not seek revocation of Braniff Airlines's operating certificate if, among other things, the defendant would terminate his involvement with the airline. Id. Despite his

-25-

agreement to the contrary, the defendant remained heavily involved with Braniff. Id. at 249-50, 252. The defendant was later convicted of conspiring to conceal from creditors property belonging to the bankruptcy estate of Braniff and bankruptcy fraud. Id. at 250. In approving the upward adjustment under § 2B1.1(b)(7)(C), the court observed that the agreement between the defendant and DOT was the result of an informal process and an informal decree in which "DOT went to considerable lengths to prevent [the defendant] from participating in [the airline]." Id. at 252. "[W]hether [the defendant] chose to submit to and violate a formal DOT process, or whether he deliberately avoided such process by giving solemn promises to DOT which he later violated, . . . [the defendant] demonstrated the same 'aggravated criminal intent' underlying [§ 2B1.1(b)(7)(C)]."[14] Id.

In reaching its decision to apply the enhancement in Spencer, the Second Circuit distinguished United States v. Linville, 10 F.3d 630 (9th Cir. 1993), on its facts. The Ninth Circuit refused to apply the upward adjustment in a case involving a defendant's disregard for "relatively informal missives and official notifications and warnings of violations" from the United States Agricultural Department regarding the illegal sale of animals. Id. at 633. Those circumstances, however, are less egregious than those in Spencer, where DOT forewent the legal procedure in favor of an agreement with the defendant that he would cease his involvement with Braniff. The defendant in Spencer entered into the agreement to avoid specific DOT action.

The Seventh Circuit approved Spencer in United States v. Mantas, 274 F.3d 1127,

---

[14]At the time the Spencer opinion was written, the applicable section was § 2F1.1(b)(3)(B). The applicable section is now § 2B1.1(b)(7)(C).

1132 (7th Cir. 2001), and in doing so was even more liberal in its application of the §
2B1.1(b)(7)(C) enhancer. Mantas involved a criminal prosecution for improper storage of
poultry and meat offered for sale. Id. at 1130. Prior to events leading to criminal charges,
defendant's premises were searched by Illinois Department of Agriculture ("IDA") inspectors
who seized a cooler containing contaminated meat. Id. at 1129. At sentencing for a
subsequent related federal offense, the district judge applied the enhancer for violation of
official process. Id. at 1132. The appellate court affirmed, finding that the "IDA's red tag was
an informal decree notifying [the defendant] that selling the tagged goods would violate state
law," a sufficient basis for applying the enhancement. Id. at 1133.

This case is similar to Spencer. In exchange for concessions made by a governmental
entity, ABC was granted a license to sell viaticals in Florida. It is obvious from the face of the
Consent Order[15] that it was a negotiated settlement resolving a dispute between ABC and the
Department of Insurance regarding whether ABC should be issued a license to sell viaticals.
The Consent Order provided that the license would be issued if ABC agreed to certain
express terms, including requirements that: 1) ABC waive its rights to further hearings and
proceedings "to which the parties may be entitled by law or by rules of the Department'" 2)
the license issued would be for a six-month probationary period; 3) "C. Keith Lamonda is no
longer an officer, director, owner, agent or employee of [ABC], has divested himself of any
and all ownership interest he may have had in [ABC], and is no longer associated with . . .
ABC except" as explained in the Consent Order; 4) C. Keith LaMonda will not have direct or

---

[15]The circumstances leading to the Consent Order were referred to in testimony
during the trial.

indirect affiliation with ABC; 5) ABC will pay a fine for each viatical agreement it entered into for a period of opportunity one year prior to issuance of the license as well as partial reimbursement to the Department for its costs; and 6) "Jennifer Ann Grinstead will act independently from C. Keith LaMonda in all matters related to [ABC]." (Consent Order, Ex. C to C. Keith LaMonda's Sentencing Mem. (emphasis omitted).) The Consent Order was the culmination of a negotiation process resulting in ABC receiving a license provided that C. Keith LaMonda divested himself of ownership and management control over ABC. Despite this agreement, C. Keith LaMonda maintained total control over ABC and profited greatly from its license to sell viaticals. I find that the Consent Order qualifies as an order, decree, or process under § 2B1.1(b)(7)(C). The LaMonda brothers' objection on this ground is overruled.

Jesse W. LaMonda makes an additional objection to the application of this enhancement. He contends that if the Consent Order qualifies under § 2B1.1(b)(7)(C), the enhancement should not apply to him because he was not a party to the agreement with the Florida Department of Insurance and because there was insufficient evidence to support a conclusion that he knew about it.

The commentary to § 2B1.1 addresses this situation in part, providing that "[i]f it is established that an entity the defendant controlled was a party to the prior proceeding that resulted in the official judicial or administrative action, and the defendant had knowledge of that prior decree or order, this enhancement applies even if the defendant was not a specifically named party in that prior case." USSG § 2B1.1 cmt. n.5(C). As his counsel points out, Jesse W. LaMonda was not a party to the agreement with the Florida Department of

-28-

Insurance and did not control ABC when the agreement was negotiated and the Consent Order was executed. In fact, at no time – before or after the Consent Order was executed– did he ever actually control ABC.

The Guidelines also provide, however, that "specific offense characteristics . . . shall be determined on the basis of . . . all acts . . . aided, abetted, [or] counseled . . . by the defendant." Id. § 1B1.3(a)(1)(A). Contrary to Jesse W. LaMonda's argument, there is ample evidence that he knew that C. Keith LaMonda was violating the Consent Order by nominally resigning control over ABC while continuing to control the company and that he assisted his brother in doing so.

I find that an upward adjustment is required under § 2B1.1(b)(7)(C). None of the authority cited by the Defendants militates against application of the prior process enhancer. The Consent Order entered in this case by Mr. Mitchell goes well beyond the "letters and notices" in Linville in establishing Defendants' aggravated intent. Even if Defendants' conduct did not violate any formal order, decree or injunction, it certainly violated the process engaged by the Florida Department of Insurance and embraced by C. Keith LaMonda. Moreover, the commentary to § 2B1.1(b)(7)(C) explains the reasons for the enhancer's inclusion in the Sentencing Guidelines scheme, providing that "[a] defendant who does not comply with such a prior, official judicial or administrative warning demonstrates aggravated criminal intent and deserves additional punishment." USSG § 2B1.1 cmt. n.5(C). Defendant C. Keith LaMonda bargained with the State for its issuance of the Consent Order, the terms of which required that he divest himself of interest in and control over ABC in exchange for a license issued to ABC to sell viaticals. Like the defendant in Spencer, C. Keith LaMonda deliberately avoided

the process of the state; he directed ABC to make promises which he promptly violated. Defendant Jesse W. LaMonda was aware of the agreement between his brother and the Florida Department of Insurance, but he assisted him in breaching that agreement. This conduct constitutes evidence of "aggravated criminal intent" underlying § 2B1.1(b)(7)(C). Defendants' objections to the application of this enhancement are overruled.

### 4. Sophisticated Means (USSG § 2B1.1(b)(8)(C))

Section 2B1.1(b)(8)(C) provides for a two-level upward adjustment when an "offense otherwise involved sophisticated means." The commentary defines "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. . . . Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts . . . ordinarily indicates sophisticated means." Id. cmt. n.6(B). Even if some aspect of the crime is "not complicated, repetitive and coordinated conduct can amount to a sophisticated scheme." United States v. Bistrup, 449 F.3d 873, 882 (8th Cir. 2006); see United States v. Fowler, 213 Fed. Appx. 788, 791-92 (11th Cir. 2007) (concluding that scheme lasting more than 5 years consisting of various means of deception and involving taking of more than $1.3 million qualified for the sophisticated means enhancer).

The applicability of § 2B1.1(b)(8)(C) in this case requires little discussion. The complexity and intricacy of each of the crimes other than Count Fifteen is described in the excellent account of events set forth in Part A of the PSRs. It is further evidenced by the testimony and exhibits received during the seven-month jury trial and an extremely protracted sentencing hearing. I agree with the Government and the Probation Office that §

-30-

2B1.1(b)(8)(C) applies to all Defendants in this case.  Defendants' objections are overruled.

### 5. Role in Offense (USSC § 3B1.1(a))

An upward adjustment was made to the total offense level of C. Keith LaMonda and Jesse W. LaMonda based on their role in the offense.  Both Defendants object.

### a. C. Keith LaMonda (USSG § 3B1.1(a))

If a defendant's role was that of "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," his offense level should be increased by 4.  USSG § 3B1.1(a).  The Government and the Probation Office urge that the 4-level aggravating role enhancement be applied in calculating C. Keith LaMonda's sentence. I agree.

C. Keith LaMonda does not argue that he was not an "organizer or leader" of both the contestable scheme and the investor scheme. He also does not challenge the Government's assertions that more than five participants were involved in the investor scheme.[16]  His only challenge to the § 3B1.1(a) adjustment is his assertion that there were not five or more participants in the contestable scheme.   The Government specifically named C. Keith LaMonda, Jesse W. LaMonda, David Piercefield, Jennifer Grinstead, and Wanda Tappan as participants in the contestable scheme, but C. Keith LaMonda argues that Wanda Tappan does not qualify as a participant because she was not convicted of a related offense.

Contrary to this argument, Ms. Tappan's conduct was sufficient for her to be included

---

[16] Apparently C. Keith LaMonda does not challenge the Government's assertion that the criminal activity of which he was convicted was "otherwise extensive" with regard to both conspiracies. Such a concession does away with the requirement that there be five or more participants for purposes of applying this enhancement. See USSG § 3B1.1(a). The Court nonetheless addresses his remaining argument.

as a participant under § 3B1.1(a). For one to be considered a participant, it is not necessary that she be convicted of a related crime so long as she is "criminally responsible for the commission of the offense." Id. cmt. n.1. Although not charged, Ms. Tappan was involved in the scheme from its inception and brokered many contestable policies to ABC.

Moreover, the role adjustment would apply without inclusion of Wanda Tappan as one of the participants. Both schemes lasted many years and relied on many others who assisted the participants in carrying out their fraudulent scheme. As the Government points out, in addition to the named participants, Gerald Fadal, Cheryl Blanton, Marlo Hohman, Melissa Moore, and others participated in ABC's fraudulent conduct, making the organization "otherwise extensive." Id. cmt. n.3. ("In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive.") C. Keith LaMonda seems to concede as much.

Therefore, I find that C. Keith LaMonda was the organizer and leader of both fraudulent schemes described in the FSI, that both schemes involved at least five participants, and that both schemes were otherwise extensive.[17]  Defendant C. Keith LaMonda's objection is overruled.

### b. Jesse W. LaMonda

The Probation Office recommends that Jesse W. LaMonda's Guidelines score be increased two levels pursuant to USSG § 3B1.1(c) because he "was an organizer, leader,

---

[17] The Court declines the Government's suggestion to consider the number of victims and amount lost in determining whether the criminal activity was otherwise extensive. To do so would duplicate enhancements already made under other Guideline provisions.

manager, or supervisor . . . in criminal activity." Jesse W. LaMonda objects to the application of this enhancer, arguing that although he held the title of president of ABC, signed documents on behalf of the business, and provided technical support, he did not function as an organizer, leader, manager, or supervisor.  The Government agrees with Jesse W. LaMonda.

The commentary to the Guidelines suggests that the sentencing judge consider "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."  Id. § 3B1.1 cmt. n.4.  Although there are facts supporting Jesse W. LaMonda's convictions, there is not a sufficient factual basis to support adjustment to his offense level based on his role in the criminal activity.  He was neither an organizer nor a leader; like everyone else at ABC, Jesse W. LaMonda took orders from his brother.  He wrote promotional material and tended to the operation's computer system.  Apparently, Jesse W. LaMonda worked long hours and received a relatively modest salary.  He did not recruit employees or direct the activities of others.  The § 3B1.1(c) enhancement does not apply to him.  Defendant Jesse W. LaMonda's objection is sustained.

### 6. Special Skill – John L. Maynard (USSC § 3B1.3)

The Sentencing Guidelines direct that there be an adjustment of the offense level of a defendant who used a "special skill" in a way "that significantly facilitated the commission or concealment of the offense."  USSG § 3B1.3.  A special skill is one that is a "pre-existing, legitimate skill not possessed by the general public."  United States v. Foster, 155 F.3d 1329,

1331 (11th Cir. 1998). Such a skill typically involves specialized and substantial education. Id. In such cases, the Guidelines score should be increased two levels. USSG § 3B1.3. The Government and Probation Office recommend that this special skill enhancement be included in John Maynard's total offense level.

Mr. Maynard's contention that this enhancement does not apply because he did not use a special skill that significantly contributed to the commission of the offense for which he was convicted is rejected. Mr. Maynard earned a law degree in 1971. He was admitted to the Florida Bar in 1971 and practiced law until he was disbarred on April 18, 1996. While practicing, Mr. Maynard specialized in real estate and commercial transactions. He used his legal skill in the investor scheme by directing the opening of an account with Merrill Lynch to conceal the diversion of money from the ABC premium reserve account. He then prepared a promissory note to cover the diversion. He again used his legal skill in advancing the tax scheme by opening a Bahamian bank account and preparing a mortgage deed and promissory note to conceal the diversion of investor money from the IRS. In furtherance of this scheme, he deposited funds in the IOTA trust account of attorney H. Stratton Smith without Smith's permission. These facts require a 2-level increase. Defendant John L. Maynard's objection is overruled.

## IV. Defendants' Motions for Downward Departure

All three Defendants urge a downward departure from the otherwise applicable Guidelines. The Guidelines were intended to identify a "heartland" of cases to which guideline-specified sentences should apply, but the Sentencing Commission recognized that when circumstances exist that render a case atypical, departure may be appropriate. USSG

ch. 1, pt. A, cmt. 4(b). When a sentencing court is presented with a case "to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted." Id.

### 1. C. Keith LaMonda

#### a. Does the loss table overstate the seriousness of the offense?

As noted above, the loss table "drives the guidelines" in fraud cases. C. Keith LaMonda contends that the loss amount calculated above overstates the seriousness of the offense. Distilled, this motion is based on two discrete theories. First, C. Keith LaMonda maintains that there is no relationship between the fraud loss table and his culpability and that this is a basis for relief. Second, he argues that because only a portion of ABC's transactions were fraudulent, a downward departure is justified.

As to his first point, there is indeed authority supporting a downward departure in those instances where there is little relationship between the amount of monetary loss (or controlled substances) and a defendant's culpability. See United States v. Stuart, 22 F.3d 76, 83 (3d Cir. 1994) ("Where application of the Guidelines' monetary tables bears little or no relationship to the defendant's role in the offense and greatly magnifies the sentence, the district court should have the discretion to depart downward."); United States v. Restrepo, 936 F.2d 661, 667 (2d Cir. 1991) (concluding that downward departure may be warranted where the offense level "bears little relation to the defendant's role in the offense").

The authority that C. Keith LaMonda relies upon is, however, inapposite to the facts in this case. That authority recognizes that a defendant's minimal involvement in a crime involving large amounts of loss or controlled substances may be a basis for downward

departure. C. Keith LaMonda was hardly a minor participant – he was responsible for the organizing and operation of the schemes that led to the convictions. Application of the loss table results in an additional 24 levels to his total offense level; while C. Keith LaMonda may believe that this result is unfairly harsh, that alone is not enough to justify a downward departure.

C. Keith LaMonda's second theory for downward departure on the ground that the loss amount overstates the seriousness of the offense is that in this case, unlike others, not all the proceeds included in the calculation of the loss were the result of fraudulent transactions. In fact, at least with regard to the purchase of insurance policies, he contends that the business was begun with legitimate intentions and only later became tainted by fraudulent conduct. This argument is, however, unavailing. See United States v. Lauer, 148 F.3d 766, 768 (7th Cir. 1998) (finding loss includes "the amount that the defendant placed at risk by misappropriating money or other property" and finding all money in Ponzi scheme should be considered intended loss even though a portion was recovered because the entire amount was placed at risk). His motion for downward departure on this basis is therefore denied.

2. Do advisory Guidelines calculations include impermissible overlapping?

As noted above, sentences for fraud prescribed by the Guidelines are driven by the loss table. In the instant case, C. Keith Lamonda's base offense level is 6; twelve points were then added for the specific offense characteristics and his role in the offense; and an additional 24 points was added for loss, resulting in a total offense level of 42. C. Keith LaMonda argues that not only does the punishment substantially increase because of loss valuation, but also that the additional increase in levels attributed to offense characteristics and role in the offense

drastically increase the punishment. Simply put, C. Keith LaMonda argues that the cumulative effect of these Guideline factors justifies a downward departure.

This argument is better understood when explained in real terms of prison time rather than in terms of abstract sentencing levels. A base level of 6 with no upward Guidelines adjustments results in a recommended sentence of 0-6 months. Twelve additional levels for specific offense characteristics and role increase the number of levels to 18 with the effect of producing a recommended sentence of 27-33 months – an increase of 27 months. If, on the other hand the only adjustment added was the 24 levels for loss, the total offense level would be 30, resulting in a sentence of 97-121 months. Adding the 12 levels for offense characteristics and role back into the equation, however, produces a total offense level of 42 with a corresponding recommended sentence of 360 months to life.[18] This means that the 12-point adjustment in offense level from 30 to 42 results in a minimum increase of 263 months.

Relying primarily on decisions from the Second Circuit, C. Keith LaMonda submits that this increase in sentence attributed to specific offense characteristics and role in the offense when combined with loss constitutes impermissible overlapping of enhancing Guidelines factors and justifies a downward departure. In United States v. Lauersen, the Second Circuit determined that "when the addition of *substantially overlapping enhancements* results in a significant increase in the sentencing range minimum (as it does at the higher end of the sentencing table)," the sentencing judge has discretion to downwardly depart pursuant to 18 U.S.C. § 3553(b)(1) and USSG § 5K2.0. 362 F.3d 160, 164 (2d Cir. 2004) (on rehearing),

───────────────

[18] The maximum possible sentence here is 876 months because a greater sentence would exceed the statutory maximum.

<u>vacated on other grounds</u>, 543 U.S. 1097 (2005).  In reaching this conclusion, the court explained that the relationship between loss valuation and other applicable guideline adjustments is a circumstance that "is present to a degree not adequately considered by the Commission."  <u>Id.</u> Although the Second Circuit found that the upward adjustment was applicable, it did put the trial court on notice that upon remand, it might consider the "overlap" as a basis for downward departure.

C. Keith LaMonda cites no appellate authority outside the Second Circuit supporting the rationale of <u>Lauersen</u> with regard to departure based on the cumulative effect of upward adjustments in Guidelines calculations.  When the Fourth Circuit was confronted with the same argument, it was not receptive.  <u>See</u> <u>United States v. Allen</u>, 491 F.3d 178, 195 (4th Cir. 2007) ("Putting aside the issue of whether <u>Lauersen</u> is viable in the Second Circuit following its vacatur by the Supreme Court, it was never the law of this Circuit.").  I find no case law from other circuit courts squarely addressing this issue.

There is no evidence regarding whether the Commission considered the effects of applying cumulative enhancers in fraud cases involving large amounts of loss.  On one hand, it seems that a fair inference exists that the Commission contemplated the severe result of applying Guidelines enhancers in fraud cases involving large amounts of loss.  On the other hand, it appears that the cumulative effect of the other enhancers is to double-count levels attributed to loss.  No party has referenced a clear expression of the Commission that this result was contemplated.

In the absence of evidence to the contrary, I assume that the Commission contemplated the kind of result produced by application of the enhancers in this case.

-38-

However, I do believe that the "cumulative effects" argument is a factor that may be considered under a § 3553(a) analysis.

### 3. Does C. Keith LaMonda's physical condition warrant a downward departure?

C. Keith LaMonda alleges, and the Government concedes, that he is in poor health. Among his maladies are coronary artery disease, diabetes, lung disease, hypertension, hyperlipidia, sleep apnea, anxiety, and depression.  His medical history includes two angioplasty procedures as well as quadruple bypass surgery. C. Keith LaMonda is currently being treated by medical specialists in the fields of cardiology, endocrinology, ophthalmology, pulmonology, psychiatry, and podiatry. See Ex. D to C. Keith LaMonda's Sentencing Mem. (Doc. 820). These specialists have prescribed sixteen different medications to address these ailments.  Based on his need for medical attention, C. Keith LaMonda has moved for a downward departure from the recommended Guidelines sentence.  In support of his motion, he has offered the testimony of two experts as to the ability of the Federal Bureau of Prisons ("BOP") to provide necessary medical care.

Anthony E. Douglas, M.D., a board-certified cardiologist, provided an affidavit outlining his assessment of C. Keith LaMonda's medical condition and opined that "Mr. LaMonda's health will be severely compromised if his access to medical care is restricted to that provided by the Federal Bureau of Prisons."  (Douglas Aff. at 1, Ex. D To C. Keith LaMonda's Sentencing Mem.)  Although Dr. Douglas was thorough in describing C. Keith LaMonda's physical condition, he did not provide a basis for his opinion regarding BOP's level of care other than a statement that he had "researched the current policies regarding medical care for the incarcerated." Id.

Phillip S. Wise also offered opinion testimony. Mr. Wise, formerly an Assistant Director of the Bureau of Prisons and Warden at the Federal Medical Center, identified health care and related problems associated with incarceration in the BOP system. He stated that it would be difficult for BOP to provide C. Keith LaMonda long-term follow-up and monitoring by cardiologists and endrocrinologists. According to Mr. Wise, BOP would be unable to provide many of the medications that C. Keith LaMonda currently takes. Should prison sanctions be imposed, Mr. Wise recommends that C. Keith LaMonda's sentence be served at the BOP facility located at Butner, North Carolina. That facility provides fragile out-patient care appropriate for his treatment. If assigned to Butner, Mr. Wise recommends that C. Keith LaMonda be confined at the prison camp because the lower security at the camp would facilitate contact with treating physicians at the Butner Medical Referral Center.

The Government objects to a downward departure based on C. Keith LaMonda's medical condition, arguing that his condition is not so extraordinary as to justify such a departure. In support of this position, the Government offered the opinion of Barbara J. Cadigan, Regional BOP Health Care Administrator. (Doc. 812-2.) Ms. Cadigan acknowledges C. Keith LaMonda's manifold medical needs but assures the Court that BOP will provide C. Keith LaMonda necessary and appropriate medical care if he is confined to a BOP facility. She also states: "Mr. LaMonda will receive appropriate medication through the BOP's formulary. I have reviewed the numerous medications he is currently taking. The BOP has these medications, or their appropriate substitutions, on their formulary, and there should be no significant waiting time to receive them if it is determined that they are medically necessary." (Id. at 2.) Additionally, she represents that a sleep apnea device would be

available if needed.  (Id.)

Section 5H1.4 of the Guidelines is a policy statement discouraging sentencing outside the recommended guideline range because of a defendant's physical condition.  The provision does, however, provide that such a departure may be appropriate when a defendant suffers from an "extraordinary physical impairment."  Id.  What constitutes "extraordinary physical impairment" is not defined within the Guidelines and case law from the appellate courts provides little guidance.

It is important to assess the care that BOP offers.  C. Keith LaMonda's experts make a strong argument that medical care provided by BOP may not be identical to that provided by providers he might select if not incarcerated.  Nonetheless, I am not convinced that C. Keith LaMonda's health would be severely compromised by the medical care available through BOP.  The conclusions of Dr. Douglas and Mr. Wise are refuted by BOP; Ms. Cadigan's report is not a boilerplate response; she has detailed C. Keith LaMonda's medical problems and assured that his needs will be met if he is confined in a BOP facility.  She has reviewed the list of medications he is prescribed and assures that they or their equivalents are available in the BOP formulary.  C. Keith LaMonda has not established that he is in need of any surgery, procedure, test or medical device that BOP will be unable to provide.  The fact that BOP is able to meet C. Keith LaMonda's medical needs weighs against the finding that his physical problems rise to a level requiring departure.

The length of the sentence recommended by the Guidelines is also a factor in deciding whether departure is appropriate due to a physical condition.  Certainly, a modest departure might be appropriate to allow a defendant to seek or continue specialized care while on home

detention. <u>See</u> USSG § 5H1.4 ("[A]n extraordinary physical impairment may be a reason to impose a sentence below the applicable guideline range; <u>e.g.</u>, in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment."). In this case a departure of 32 levels would be required to accommodate such a result. While it is difficult to imagine a physical impairment sufficiently extraordinary to justify such a departure, I am certain that C. Keith LaMonda's maladies fail to meet that test. C. Keith LaMonda's motion for downward departure because of his physical condition is denied.

### B. Jesse W. LaMonda

#### 1. Does the Guidelines loss table overstate the seriousness of the offense?

Jesse W. LaMonda's argument for downward departure on the basis that the loss table overstates the seriousness of his offenses has slightly more appeal than the same arguments advanced by his co-defendants.   His argument is more credible simply because there is no indication that his conduct was motivated by personal greed. He received relatively modest compensation for his efforts on behalf of ABC and his brother. Nonetheless, he was intricately involved in the business and understood that it was rife with fraud. Yet, he continued to work for the company assisting his brother and others execute their fraudulent schemes.

The Guidelines themselves acknowledge that the offense level resulting from the loss determination may "substantially overstate the seriousness of the offense" warranting a downward departure. U.S.S.G. §2B1.1 cmt. n.15. Case law provides further guidance as to when downward departures should be granted on this basis. The district court <u>United States v. Roen</u>, 279 F. Supp. 2d 986, 990-91 (E.D. Wis. 2003) described four scenarios in which departures have been approved, with the first three typically bearing on actual loss. The first

scenario is where there are multiple causes for the loss in addition to the defendant's fraudulent conduct. Id. at 990. The second is "when the defendant plays a limited or inferior role in the scheme that bore little relationship to the amount of loss determined under the guideline." Id. at 991. The third scenario occurs in those cases where "the defendant's effort to remedy the wrong merits consideration, as, for example, where he makes extraordinary restitution or, in a fraudulent loan case, where he had sufficient unpledged assets to cover the loss." Id. Finally, downward departures may be available when the loss is intended rather than actual and the scheme is "obviously doomed to fail and which causes little or no actual loss." Id. This situation would exist, for example, when there is little actual loss and the defendants "who devise ridiculous schemes (1) do not ordinarily have the same mental state and (2) do not create the same risk of harm as those who devise cunning schemes." Id.; see also United States v. McBride, 362 F.3d 360, 375 (6th Cir. 2004). None of these scenarios apply to the criminal conduct at issue here. Jesse W. LaMonda's motion for downward departure on grounds that the loss table overstates the seriousness of the offense is denied.

### 2. Do advisory Guidelines calculations include impermissible overlapping?

The cumulative effect of multiple enhancers is significant in determining the total offense level to be applied to Jesse W. LaMonda.   His base level is 6, carrying a recommendation of 0-6 months in prison. He has a total of 8 levels added for specific offense characteristics and role. Without loss calculation, his total offense level would be 14 and the Guidelines sentence would be 15-21 months, an increase of 15 months attributable to specific offense characteristics. Applying the 24 levels attributed to loss to the base offense level of 6, without adding the 8 offense characteristic points, results in a total of 30 levels, or a

sentence of 97-141 months.  But, adding back the 8 specific offense characteristic levels and raising the total offense level to 38 produces a surprisingly higher recommended sentence of 235-293 months, or an increase of 138 months.

As I explained above, I cannot conclude that the Sentencing Commission did not consider this result when it approved the loss table without reference to its effect on other enhancing factors.  Therefore, I will not depart on that basis, but I will consider the issue of overlapping enhancers in determining an appropriate sentence under § 3553(a).

**C.  John L. Maynard**

*1.  Does the Guidelines loss table overstate the seriousness of the offense?*

The Guidelines do not overstate the seriousness of Mr. Maynard's offense.  His argument on this point focuses on the issue of forseeability and, therefore, his guilt.  These issues have been resolved.  The calculations provided by the Probation Office and advanced by the Government take into consideration that Mr. Maynard was not involved in the insurance fraud at its inception.  He has been held accountable only for losses that occurred after he became a participant in the conspiracies.  Mr. Maynard's motion for downward departure on grounds that the loss table overstates the seriousness of his offense is denied.

*2.  Do advisory Guidelines calculations include impermissible overlapping?*

Mr. Maynard's argument is the same as that of his co-defendants.  The mathematical analysis is identical to that of Jesse W. LaMonda; the base level and the levels attributed to loss, specific offense characteristics, and role in the offense are the same.  The offense characteristics and role factors have the same exaggerated effect.  Although, Mr. Maynard's motion for downward departure on this ground must be denied, the Court will consider the

-44-

cumulative effect of the enhancers under its § 3553(a) analysis.

## V.  Analysis Pursuant to 18 U.S.C. § 3553(a)

Having resolved the issues raised by the parties in an attempt to calculate a correct Guidelines score, it is now incumbent upon me to impose a sentence that is reasonable. 18 U.S.C. § 3553(a) requires the court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.  Those purposes are: "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).  In crafting a reasonable sentence that meets these requirements, the court is mandated to consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; . . . (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . issued by the Sentencing Commission . . . ; (5) any pertinent policy statement . . . issued by the Sentencing Commission . . . ; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

Id. § 3553(a).

### A.  C. Keith LaMonda

#### 1. Nature and circumstances of offense

There is no question that the crimes committed by C. Keith LaMonda are serious.  As

reflected by the application of the specific offense characteristics, the conspiracies were vast, involving many victims and millions of dollars. C. Keith LaMonda's suggestion that his conduct was in furtherance of humanitarian goals is emphatically rejected. The crimes of conviction were committed as a result of C. Keith LaMonda's personal greed.

It must also be noted, however, that not every transaction entered into by ABC at C. Keith LaMonda's direction was fraudulent. In fact, most of the life insurance policies purchased by ABC were not fraudulently procured, and, at least in the beginning, C. Keith LaMonda believed that most investors would get all of their money back as well as a profit. Some did. I have considered the nature and the circumstances of the offenses including those discussed in the application of the Guidelines.

### 2. Defendant's history and characteristics

C. Keith LaMonda's history and characteristics are also considerations in determining a reasonable sentence, but, for the most part, they are unremarkable. He has a good relationship with family members and is described by them as generous. On the other hand, he enjoyed a self-indulgent and luxurious lifestyle at the expense of his victims.

According to the PSR, C. Keith LaMonda has no prior criminal record. It is noteworthy that, notwithstanding the seriousness of his various crimes in this case, as a first time offender, he falls in a Guidelines range of 30 years to life.

### 3. Disparity in sentencing

In determining a reasonable sentence, the district court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been

found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).[19] Defendants make three arguments regarding the application of this factor. First, they contend that the sentences called for by the Guidelines are disproportionate to sentences imposed by other federal courts for convictions of fraud and conspiracy. Next they argue that their sentences should not be significantly different from the sentences imposed upon Jennifer Lauer and David Piercefield who entered pleas of guilty for their conduct in the same fraudulent schemes leading to Defendants' convictions. Finally, Jesse W. LaMonda and Mr. Maynard argue that their sentences should be proportionate to their limited conduct in relation to that of C. Keith LaMonda and others.

Notwithstanding the fact that the Guidelines were implemented to narrow disparity in sentences imposed upon similar defendants for similar conduct, Defendants argue that implementation of the Guidelines in this case would have the opposite effect. Defendants, relying on the analysis of their expert witness, Herbert J. Hoelter, co-founder of the National Center on Institutions and Alternatives, contend that the Guideline ranges calculated by the Probation Office are well beyond the national averages of sentences imposed for offenses scored under §§ 2B1.1 and 2F1.1 of the Guidelines. At the sentencing hearing in this case, Mr. Hoelter testified that based on his analysis of data collected by the United States

---

[19]It was Congress's concern with sentencing disparity that prompted enactment of the Sentencing Reform Act of 1984, authorizing the United States Sentencing Commission to:
> provide certainty and fairness in meeting the purposes of sentencing, avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct while maintaining sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices.

28 U.S.C. § 991(b)(1)(B).

-47-

Sentencing Commission, of the 549 defendants sentenced for criminal fraud involving loss between $7 and $20 million over the past 6 years, 67 (12.2%) were sentenced to a term of probation and 482 (87.8%) were sentenced to prison for an average term of 48.4 months.[20] Finally, his research indicated that during the period covered by his research, no one had been sentenced to life in prison for fraud.

The problem with relying on national averages in determining whether a sentence is disparate was identified and discussed in United States v. Willingham, 497 F.3d 541(5th Cir. 2007).   In a strongly worded opinion, the Willingham court rejected the use of national averages in assessing disparity, finding that such "averages of sentences that provide no details underlying the sentences are unreliable to determine unwarranted disparity because they do not reflect the enhancements or adjustments for the aggravating or mitigating factors that distinguish individual cases." Id. at 544.  The averages presented  "disregard individual circumstances and only reflect a broad grouping of sentences imposed on a broad grouping of criminal defendants; consequently, they are basically meaningless in considering whether a disparity with respect to a particular defendant is warranted or unwarranted." Id. at 544-45. The problem is that national averages do not reveal the respective conduct of defendants, the nature and circumstances of the offense, a defendant's role in the offense, the specific offense characteristics, or other relevant data used in correctly determining the Guidelines range and appropriate sentence.

---

[20]Mr. Hoelter described the results of his analysis of penalties imposed for fraud offenses involving loss in excess of $100 million as "startling." Of the 101 defendants sentenced, 23 (22.8%) received probation; the average term for the 78 sentenced to prison was slightly over 70 months.

Aware of the criticism leveled at reliance on national averages to determine disparity in Willingham, Mr. Hoelter attempted to narrow the group of offenders in the analysis offered in this case. He did this by comparing the sentences imposed for offenses scored under USSG §§ 2B1.1 and 2F1.1 used for scoring fraud violations and by reference to the § 2B1.1 loss table. He further narrowed his analysis to sentences imposed on offenders falling within criminal history category I. By narrowing the field of comparators, Mr. Hoelter went some distance in answering the criticisms leveled by Willingham, but he was not entirely successful.

As revealed by the Government's cross examination, there were many relevant issues unaddressed in Mr. Hoelter's analysis. For instance, there was no effort to compare sentences imposed for the crimes committed by Defendants in this case. There are many offenses, including conspiracy, charged under different statutes with different statutory maximums, all scored under §§ 2B1.1 and 2F1.1. There is no indication that sentences imposed pursuant to statutes with lower maximum penalties did not skew the averages used by Mr. Hoelter in his comparison. The averages calculated by Mr. Hoelter also included sentences imposed on defendants who had received downward departures under § 5K1.1. Finally, the analysis failed to account for those sentences that were adjusted upward due to specific offense characteristics and role. Perhaps it is not possible to account for all of these variables, but without doing so, a comparison to national averages is not particularly helpful.

Defendants also contend that any sentence imposed on them should be not be disparate to the sentences imposed on others for their related criminal conduct. In support of this argument, Defendants point out that Jennifer Lauer (a/k/a Jennifer Grinstead), who assisted C. Keith LaMonda in starting and running ABC, received only a 4-month sentence

after entering a plea of guilty to the charge of Filing a False Income Tax Return, a charge related to Count 14 of the FSI.  Defendants also note that David Piercefield, who was intricately involved with ABC and assisted the Defendants in carrying out their fraudulent schemes, received a sentence of probation and a fine following a plea of guilty to the charge of Conspiracy to Defraud the United States.   Lauer and Piercefield entered into plea agreements with the Government and agreed to cooperate in the prosecution of the Defendants. Both testified for the Government in the trial against Defendants and received the benefit of motions for downward departure for having provided substantial assistance to the Government pursuant to USSG § 5 K1.1. The motions were granted.

Defendants' argument is also anchored in the requirement contained in 18 U.S.C. § 3553(a)(6), requiring sentencing courts to consider the "need to avoid *unwarranted* sentence disparities among defendants with similar records who have been found guilty of *similar conduct.*" (Emphasis added). The appellate courts are divided as to whether this mandate applies to sentences imposed upon co-defendants, or whether it is in furtherance of an effort to achieve consistency among judges and districts throughout the nation.[21]  It is not necessary

---

[21] See United v. Wills, 476 F.3d 103, 109 n.5 (2d Cir. 2007) (noting that "[s]ince Booker, circuit courts have taken diverse positions on whether the phrase 'unwarranted sentence disparities' in § 3553(a)(6) permits consideration of co-defendants' sentences."); see, e.g., United States v. Davis, 437 F.3d 989, 997 (10th  Cir. 2006) (co-defendant comparisons not permitted); United States v. Walker, 439 F.3d 890, 893-94 (8th Cir. 2006) (assuming with little discussion that § 3553(a)(6) *requires* consideration of co-defendant disparity); United States v. Parker, 462 F.3d 273, 277 (3d Cir.) (holding that a district court is not *required* to consider sentencing disparity among co-defendants but is *permitted* to do so in certain circumstances and in a particular manner), cert. denied, 127 S. Ct. 462 (2006). In United States v. Willis, 139 F.3d 811, 812 (11th Cir. 1998), the Eleventh Circuit held that "disparate sentencing among federal co-defendants was adequately considered by the Sentencing Commission and is therefore not an appropriate ground for departure."

to decide that issue in this case, however, because Ms. Lauer and Mr. Piercefield are not similarly situated and the disparity in their sentences as compared to those imposed on Defendants here is not unwarranted; therefore, it is unnecessary to consider whether the sentences imposed upon them by other judges is a factor that should influence my determination of a reasonable sentence for the three Defendants before me. See United States v. Boscarino, 437 F.3d 634, 637-38 (7th Cir. 2006), cert. denied, 127 S. Ct. 3041 (2007).

Any disparity resulting from the less severe sentences imposed on Ms. Lauer and Mr. Piercefield does not qualify as unwarranted; it is a mere difference in sentencing only. See United States v. Pisman, 443 F.3d 912, 916 (7th Cir.), cert. denied, 127 S. Ct. 413 (2006) (finding disparity with co-defendant who cooperated and received substantial assistance departure not "unwarranted" under § 3553(a)(6)). The Guidelines specifically contemplate disparate sentences among co-defendants, some of whom have received reductions in their sentences pursuant to § 5K1.1. That section provides that "[u]pon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines." USSG § 5K1.1. If this were not the case, courts granting § 5K1.1 motions would be prospectively limiting their discretion in sentencing co-defendants. Worse yet, the same argument could be made when co-defendants are sentenced by other judges. See United States v. Yeje-Cabrera, 430 F.3d 1, 25 (1st Cir. 2005) ("The fact that the defendant who pleads gets a benefit over those who go to trial and are convicted is a necessary artifact of any plea bargaining regime.").

With regard to the request of Jesse W. LaMonda and Mr. Maynard that their sentences be proportionate to their conduct in relation to that of their co-defendant and one another, I note that it is my goal to achieve consistency and proportionality to the extent possible. While the Guidelines attempt to achieve proportionality among co-defendants by taking into account a defendant's role in the offense as well as other specific offense characteristics, they are not always successful in this regard. I take the mandate to avoid unwarranted disparity in sentencing seriously, and, using the Guidelines and all other relevant information available, including the relative conduct of Defendants in this case, have endeavored to arrive at reasonable sentences.

### 4. Kinds of sentences available

I have considered the types of sentences available, and having done so, conclude that to satisfy the purposes of sentencing set forth in § 3553(a), a substantial prison sentence is required. In reaching this conclusion, I have considered the Guidelines-recommended sentencing range and policy statements issued by the Sentencing Commission. The Guidelines have been helpful in making a sentencing decision; however, after giving the fraud loss substantial significance, a sufficient sentence may be achieved without giving full weight to the specific offense characteristics and role as provided by the Guidelines.

### 5. The need to provide defendant medical care

As noted, the court has considered C. Keith LaMonda's physical condition and his need for medical care. His physical condition does not substantially affect sentencing.

### 6. The need to provide restitution

The restitution required in this case is substantial. It is unlikely that a lesser sentence

-52-

would significantly affect C. Keith LaMonda's ability to pay.

Having considered these factors, I believe that a sentence of 240 months is sufficient, but not greater than necessary, (a) to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (b) to afford adequate deterrence to criminal conduct; (c) to protect the public from further crimes of the defendant; and (d) to provide defendant with necessary medical care.

### B. Jesse W. LaMonda

#### 1. Nature and circumstances of the offense and Defendant's history and characteristics

Jesse W. Lamonda played a significant role in the operation of ABC and allowed his brother to use the company to execute the fraud schemes that resulted in the crimes of his conviction. He was, however, not the innovator of the fraudulent schemes and most of his responsibilities had to do with administrating the company office. He, like all others involved with ABC, followed the instructions of C. Keith LaMonda. The PSR shows that Jesse W. LaMonda has no prior criminal record.

#### 2. Defendant's personal characteristics and personal history

Jesse W. LaMonda, unlike his brother, does not appear to have been motivated by greed. He did not profit greatly from the schemes, taking only a comparatively modest salary from the company. Jesse W. LaMonda has unselfishly and generously attempted to meet the special needs of his family. He is highly educated and throughout his life he has used his education and experience to assist others.

#### 3. Disparity in sentencing

As explained earlier, I have considered the arguments that imposition of significant

-53-

prison time in this case would be contrary to my obligation to impose a sentence that avoids unnecessary disparity. I have also considered the relative culpability of Jesse W. LaMonda to that of his co-defendants in this case. For the reasons stated, the sentence imposed does not result in unwarranted disparity.

### 4. Kinds of sentences available

I have considered the types of sentences available, and having done so, have concluded that to satisfy the purposes of sentencing in § 3553(a), a substantial prison sentence is required. In reaching this conclusion, I have considered the Guidelines-recommended sentencing range and policy statements issued by the Sentencing Commission. The Guidelines have been helpful in making a sentencing decision; however, after giving the fraud loss substantial significance, a sufficient sentence is achieved without giving full weight to the loss table, which does not take into account relative culpability with regard to the overt acts of the Defendants. It is also unnecessary to impose the full weight of the specific offense characteristics as provided by the Guidelines.

### 5. The need to provide defendant with training or medical care

Jesse W. LaMonda is not in need of educational training or significant medical care.

### 6. The need to provide restitution

The restitution required in this case is substantial. It is unlikely that a lesser sentence would significantly affect Jesse W. LaMonda's ability to pay.

Having considered these factors, I believe that a sentence of 160 months is sufficient, but not greater than necessary to achieve the statutory goals of sentencing.

**C. John L. Maynard**

### 1. Nature and circumstances of the offense and Defendant's history and characteristics

John L. Maynard had a much less significant role in the operation of ABC than his co-defendants. He joined the conspiracies late and ceased full-time work with ABC and the LaMondas early. He was, however, instrumental in assisting C. Keith LaMonda in making personal investments using premium account escrow funds and in perpetrating the tax fraud. He, like all others involved with ABC, followed the instructions of C. Keith LaMonda. The PSR indicates that Mr. Maynard has no prior criminal record.

### 2. Defendant's personal characteristics and personal history

John L. Maynard is a recovering alcoholic and has made significant progress in overcoming his disease. In doing this, he has demonstrated considerable strength of character. He now has a stable family life and a loving and supporting wife. He has the support of many other family members, including his daughter who is a tenured professor at a major university.

Unfortunately, Mr. Maynard's conduct in this case is not inconsistent with the dishonest conduct that led to the loss of his license to practice law in Florida. See The Florida Bar v. John Lobban Maynard, 672 So. 2d 530 (1996). In this case, he assisted C. Keith LaMonda in raiding trust funds to fund personal investments. Because of his education, intelligence and experience, I conclude that Mr. Maynard fully appreciated the significance of his illegal conduct.

### 3. Disparity in sentencing

As explained earlier, I have considered the arguments that imposition of significant prison time in this case would be contrary to my obligation to impose a sentence that avoids

unnecessary disparity. I have also considered the relative culpability of Mr. Maynard to that of his co-defendants in this case. For the reasons stated, the sentence imposed does not result in unwarranted disparity.

### 4. Kinds of sentences available

I have considered the types of sentences available, and having done so, I have concluded that to satisfy the statutorily mandated purposes of sentencing in § 3553(a), a substantial prison sentence is required. In reaching this conclusion, I have considered the Guidelines-recommended sentencing range and policy statements issued by the Sentencing Commission. The Guidelines have been helpful in making a sentencing decision; however, after giving the fraud loss substantial significance, a sufficient sentence is achieved without giving full weight to the loss table, which does not take into account relative culpability with regard to the overt acts of the Defendants. It is also unnecessary to impose the full weight of the specific offense characteristics as provided by the Guidelines.

### 5. The need to provide defendant educational training or significant medical care

John Maynard is not in need of educational training or significant medical care.

### 6. The need to provide restitution

The restitution required in this case is substantial. It is unlikely that a lesser sentence would significantly affect Mr. Maynard's ability to pay.

Having considered these factors, I believe that a sentence of 120 months is sufficient, but not greater than necessary to achieve the statutory purposes of sentencing.

## VI. Conclusion

In accordance with the requirements of <u>Gall v. United States</u>, No. 06-7949, 2007 WL

-56-

4292116, at *7 (U.S. Dec. 10, 2007), in determining what a reasonable sentence would be for each Defendant in this case, I began by attempting to correctly calculate applicable Guidelines ranges.  Keeping the Guidelines ranges in mind, I gave the parties the opportunity to explain to me the sentences they believed appropriate.  In the end, I considered the factors under 18 U.S.C. § 3553 in determining reasonable sentences for each Defendant.  Having fulfilled this responsibility to impose sentences that I believe are sufficient, but not greater than necessary, to meet the statutorily prescribed purposes of sentencing, I note that I would have imposed the same sentences if my calculations of Guidelines ranges had been different.

DONE and ORDERED in Orlando, Florida on this 2d day of January, 2008.

JOHN ANTOON II
United States District Judge

Copies furnished to:

United States Marshal
United States Attorney
United States Probation Office
United States Pretrial Services Office
Counsel for Defendant
C. KEITH LAMONDA
JESSE W. LAMONDA
John L. Maynard